

**FILED**

**JANUARY 29, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RICHARD E. BRUNÉ** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | **Case No.**   **08 C 624** |
| ) | |
| **v.** ) | **Jury Trial Demanded** |
| ) | **JUDGE MORAN** |
| **STRING LETTER PUBLISHING, Inc.,** ) | **MAGISTRATE JUDGE COLE** |
| **d/b/a ACOUSTIC GUITAR MAGAZINE** ) | |
| ) | |
| **Defendants.** ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Richard E. Bruné (R.E. Bruné) complains against Defendant String Letter

Publishing, Inc., d/b/a Acoustic Guitar Magazine ("AG Magazine") as follows:

**NATURE OF THIS ACTION**

1)      Over the past 41 years, R.E. Bruné has built a reputation and name as one of the

world's leading luthiers of classical and flamenco guitars, as well as an expert on the history,

design, and construction of classical and flamenco guitars.  In particular, R.E. Bruné is

recognized as an expert on the guitars built by Herman Hauser I, who gained world-wide fame

through Andrés Segovia's use and endorsement of his guitars.

2)      Due to his reputation, during June of 2007, the publishers of the AG Magazine

asked R.E. Bruné to "author" an article on the  Hauser family.  After submitting an original and a

revised draft, on September 5, 2007, the AG Magazine informed R.E. Bruné, in an email, that

"things are looking good so far."   Thereafter, R.E. Bruné heard nothing further regarding his

article from the AG Magazine other than notification that they could not fit all of the

photographs he had submitted into the article.

3)     During early December of 2007, R.E. Bruné discovered as he passed a news-stand containing the AG Magazine, that the AG Magazine had published an article purportedly by him in its January, 2008 issue. However the published article bore little resemblance to the article Bruné had authored for publication.

4)     The article that was published was a version that R.E. Bruné did not write, had never seen prior to publication, had not approved, nor would have ever approved.  In addition to turning the submitted article from a scholarly discussion of the subject into an often false discussion of the subject matter, the editors of the AG Magazine added whole new sections, photos and sentences to the article that were neither written nor approved by Bruné.  Much of the added language was false and appeared to have been intentionally added by the editors of the AG Magazine in order to promote and endorse guitars sold by one of its major advertisers, Guitar Salon International, d/b/a Tornavoz Music ("GSI").

5)     The publication of the false article by the AG Magazine has and will cause significant damage to R.E. Bruné's name and reputation as a leading expert on the history, design, construction of classical and flamenco guitars.   In addition, the AG Magazine's publication of the false and misleading article made it appear that R.E. Bruné was endorsing GSI and its products.

6)     Based on the foregoing, R.E. Bruné brings this action to force the AG Magazine to remove the false article from its website and all undistributed magazines in which the article exists; publish an article or letter fully acknowledging that they inserted statements and photos in the article which had not been authorized by R.E. Bruné as well as a letter from R.E. Bruné

which will fully set forth the problems with the article. R.E. Bruné also brings this action to recover damages for the harm to R.E. Bruné's reputation and name caused by the AG Magazine publication of a false and misleading article under his name.

## PARTIES

7)    Richard E. Bruné is a resident and citizen of the State of Illinois, and currently maintains a shop in Evanston, Illinois and lives in Wilmette, Illinois.

8)    String Letter Publishing, Inc. is a California corporation engaged in the business of publishing. In particular String Letter Publishing, Inc. publishes the AG Magazine which is distributed nationally within the United States and in Cook County, Illinois.

## JURISDICTION AND VENUE

9)    This Court has original jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338 in that this action involves rights protected under the Lanham Act (15 USC § 1125(a)). Additionally, this Court has supplemental jurisdiction over common law and state statutory claims pursuant to 28 USC § 1367, in that the claims arise from the same case or controversy as the Lanham Act claim.

10)    Venue is appropriate within this judicial district as a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## RELEVANT FACTS

A)    **R.E. Bruné's Background, Expertise and Reputation**

11)    R.E. Bruné is a self-taught flamenco guitar player and luthier. Starting in 1966, R.E. Bruné began making guitars from his home in Dayton, Ohio. In 1972, after continuing to build guitars on a part-time basis and playing flamenco guitar professionally in various troupes in

Mexico, R.E. Bruné moved to Chicago and started making guitars on a full-time basis. In 1973, R.E. Bruné moved to his present location at 800 Greenwood Street in Evanston, Illinois, where he maintains a museum of rare and historical guitars, a showroom which he uses to sell classical and flameco guitars made by other leading classical and flamenco luthiers and a shop where he builds his own guitars, lutes, harpsichords and other stringed instruments as well as appraises, repairs and restores stringed instruments. Over his forty-one year career, R.E. Bruné has built 700 guitars, 50 lutes, 12 harpsichords, a violin and two Arabic ouds. In addition, R.E. Bruné has allowed the use of his name ("R.E. Bruné") to be used in connection with the construction and sale of instruments made by other luthiers pursuant to his stringent design and specifications.

12)    As R.E. Bruné's reputation has grown, so has the list of famous artists who play and own R.E. Bruné instruments. For example, over the years, artists such as the late Andrés Segovia (who owned two Bruné instruments), the Romeros, El Moraito de Jerez, Earl Klugh, the Pearl Gray Duo, Igor Kinpnis (harpsichord) and many others, have owned and played Bruné instruments. Currently, there is a six year waiting list for a new R.E. Bruné guitar, and as such, Bruné has stopped taking orders beyond that time.

13)    In addition to his reputation as a guitar maker, R.E. Bruné has also developed a reputation as a leading expert on the history, design, restoration, repair and appraisal of rare and historical stringed instruments. As such, he has sold, appraised, and restored guitars originally made by such famous builders as Torres, Simplicio, Barbero, Fleta and Hauser I and others.

14)    In addition, R.E. Bruné has published over 100 articles relating to the history, design and construction of classical and flamenco guitars; he is a founding father of *American Lutherie*: he has lectured at museums such as the Smithsonian Institute and the New York

4

Metropolitan Museum of Art; and was featured in the PBS documentary, Los Romeros: The Royal Family of the Guitar.

15)     In particular, R.E. Bruné is recognized as an expert on the guitars built by Herman Hauser, Sr. who built one of the most famous guitars in the world for Andres Segovia in 1937. R.E. Bruné was responsible for drafting the technical details of Andres Segovia's 1937 Hauser, Sr. guitar, which is now on display at New York's Metropolitan Museum of Art. R.E. Bruné's work relating to this guitar was contained in the book published in Italy by Dynamic in 2004, *The Guitar of Andres Segovia:* Hermann Hauser 1937.

16)     As demonstrated by the previous allegations, R.E. Bruné's good name and reputation not only serves his financial needs but also his ability to work at the top of his field with other luthiers, academia, museums, publishers and the like.

**B)     Acousitic Guitar Solicits An Article on Hermann Hauser from Bruné**

17)     On June 28, 2007, Charles Saufley, an associate editor with the Acoustic Guitar Magazine sent an email to R.E. Bruné stating:

Hi Richard,

Good to make your digital acquaintance. Teja [another editor] and I have been considering a feature on Hauser guitars and their history for the January edition of Acoustic Guitar. In the event we move ahead with the article, would you be at all interested in authoring the piece? The deadline would be the last week of August and we could pay you 500 bucks? Give me a holler and let me know what you think.

Thanks Richard,

Charlie

18)     On the same day, R.E. Bruné responded to Acoustic Guitar's request with an email indicating that he would be interested in authoring such an article.

19)    On July 9, 2007, R.E. Bruné submitted a draft article to the Acoustic Guitar.  A true and correct copy of this draft is attached hereto as Exhibit A.

20)    Following receipt of the initial draft, Saufley sent a marked up draft to R.E. Bruné for review and comment. A true and correct copy of the marked up draft is attached hereto as Exhibit B.

21)    After receiving the AG magazines comments, R.E. Bruné revised his article and submitted a revised draft on September 4, 2007. A true and correct copy of R.E. Bruné's revised draft is attached hereto as Exhibit C.

22)    Following receipt of the revised draft, on September 5, 2007, Saufley sent an email to R.E. Bruné thanking him for his revisions and stating "Thanks again for being so thorough and on top of things. From what I've seen, things are looking good so far."

23)    Following Saufley's email stating that everything was "looking good," R.E. Bruné heard nothing further from the AG Magazine until early November of 2007 when he received an email requesting his social security number so that the AG Magazine could issue him the fee for his article of $500.   In response, R.E. Bruné called Saufley to provide him with the requested information.  During the phone call, other than informing R.E. Bruné that the AG Magazine did not have room to publish all of the submitted photographs, Saufley made no mention of further revision to the article.

**C)    The AG Magazine Publishes A Different Article Under Bruné's Name.**

24)    The January 2008 edition of the AG Magazine included an article entitled "Hauser Guitars" which falsely listed "R.E. Bruné" as the author of the article. A true and correct copy of this article is attached hereto as Exhibit D.  In addition, the AG Magazine published the

false article on its website.

25)      During early December, 2007, R.E. Bruné came across the AG Magazine's January 2008 edition at a newsstand.  Upon review, R.E. Bruné learned for the first time that the AG Magazine had thrown out major portions of the article he had submitted and instead input false and inaccurate statements that he would never have made. At that time, R.E. Bruné also saw that despite claiming to not have enough room for the photographs he had tendered to the AG Magazine, the AG Magazine had instead inserted under R.E. Bruné's name, photographs which appeared to have been provided by GSI, a competitor of R.E. Bruné's and a major advertiser with the AG Magazine.

26)      Attached as Exhibit E hereto is a redline comparison of  the last version of the article submitted by R.E. Bruné with the published article which shows the magnitude of the unauthorized false additions and changes made by the AG Magazine. For example, out of the approximately 2,164 words submitted by R.E. Bruné, approximately only 916 words survived in the published article.  Making matters worse the substance of the article was significantly and drastically changed so that someone knowledgeable reading the article would have assumed that R.E. Bruné did not know his subject area and was a charlatan.

D)      **False Statements of Value and Endorsement of Hauser II and III Guitars**.

27)      On page 73 of the published article, the AG Magazine inserted a parenthetical purportedly by Bruné referring to a sidebar article written by Teja  Gerken which puffed the continuing legacy of Hauser III.  In combination with this false endorsement, the editors of the AG Magazine wrote a new conclusion to the article which was primarily a puff piece for Hauser II guitars and which stated in part:

**Today, guitars built by Hermann Hauser I and his son fetch tens of thousands of dollars at auction.**

As further alleged below, R.E. Bruné did not write this paragraph and had intentionally left out any mention of value because there is a substantial difference between the guitars of Hauser I and Hauser II, with Hauser I's guitars going for as much as $150,000 or more and Hauser II's instruments going for far less. Additionally, R.E. Bruné had intentionally not submitted any discussion about value because he believed that the subject was based on too many different factors (i.e., condition, originality and inherent musical qualities) to adequately cover the subject.

28)     The damage to R.E. Bruné's reputation from a false statement of value is dramatic. Because R.E. Bruné's business consists in part in appraising, selling and restoring famous and historical guitars (such as those of Hauser, I), a purported statement by R.E. Bruné that a Hauser I guitar only sells for "tens of thousands" of dollars is obviously damaging.

**E)     False Endorsement of GSI and Tornavoz Music**

29)     The article submitted by R.E. Bruné focused on the many Spanish makers who influenced Hauser I's designs. As submitted by Bruné, the article noted that after Hauser I met Segovia, through Miguel Llobet, Hausser I began building guitars "in the style of Antonio de Torres" and that "Hauser began creating his personal Spanish models based on several different Spanish models including Torres, Manuel Ramírez, Santos Hernandez, and others." Later in his article Bruné also notes that Hauser took many external cues from Torres (particularly the 1859 instrument owned by Llobet), Santos Hernandez, Manuel Ramírez (owned by Segovia), and even Francisco Simplicio and Enrique Garcia."

30)     Other than the passing reference that one of the many guitars which influenced Hauser's external design was a Manual Ramírez owned by Segovia, Bruné's submitted article

includes no specific discussion of the importance of that guitar either to Hauser's design or to

Segovia.

    31)    However, as re-written by the AG Magazine, the article instead focuses on

"Ramírez" guitars.  For example:

    A)    Bruné's statement that:

"Hauser began creating his personal Spanish models based on several different Spanish models including Torres, **Manuel Ramírez**, Santos Hernandez, and others."

    Turns into the statement:

 "He created his own Spanish models using the work of Torres, Santos Hernandez, **and, of course, Ramírez,** as a starting point.

    B)    Bruné's statement that:

"Encouraged by Segovia who was just beginning his international career, in 1924 Hauser began making guitars in the style of Antonio de Torres."

    Turns into the statement by the AG Magazine:

"While staying in Munich, Segovia, who at the time played a **Manual Ramírez** guitar, tried one of Hauser's Viennese-style instruments and was dazzled by its exceptional craftsmanship. Segovia offered his **Ramírez** to Hauser for inspection, and as he left Munich, made no secret of his desire for a Hauser that matched the dimensions of his beloved **Ramírez**."

    C)    Bruné's statement that:

"Hauser took many external cues from Torres (particularly the 1859 instrument owned by Llobet), Santos Hernandez, **Manuel Ramírez** (owned by Segovia), and even Francisco Simplicio and Enrique Garcia."

    Turns into the statement by the AG Magazine that:

"Hauser took many decorative design cues from Torres, Hernandez, and **Manuel Ramírez**."

    32)    The AG Magzine's changes are misleading in each of the following ways:

    A)    The switch in focus from the many Spanish maker's who influenced

Hauser I's development of a Spanish style instrument is switched to a focus on  "Ramírez," thus

suggesting that the guitars made by the Ramírez family was the sole or defining influence on Hauser I's designs;

B)    Relatedly, the AG Magazine failed to distinguish between Manaul Ramírez and José Ramírez. The article submitted by Bruné, except in one reference where the context did not require it, distinguished between the guitars made by Manual Ramírez versus José Ramírez, as historically, their was a rift between Manual and José Ramírez, and today, guitars referred to as "Ramírez" guitars, are actually those made by the descendants of José Ramírez and not Manual Ramírez.

C)    While its is true that Segovia provided his Manual Ramírez guitar to Hauser for inspection, any accurate discussion of the topic would have also required a discussion of the fact that another famous Spanish luthier, Santos Hernandez, is believed to have built Segovia's guitar while working under Manual Ramírez.

33)    Exacerbating the changes made by the AG Magazine is that the motivation for changing Bruné's submitted article appears to not have been grounded in any legitimate editorial purpose, but instead was motivated by the AG Magazine's desire to promote the guitars sold by one of its major advertisers, Guitar Salon Interanational, d/b/a Tornavoz Music ("GSI"), as evidenced by the following facts:

A)    As noted above, rather than use photograph submitted by Bruné, the AG Magazine used photographs supplied by GSI;

B)    GSI, through a company known as Tornavoz Music, has the exclusive rights to distribute guitars made by or for the José Ramírez family in the United States. Not surprisingly, the January edition of the AG Magazine also features a two-thirds page ad for

Tonavoz Music and Jose Ramirez, as well as a two page feature article on the 125th year anniversary Ramírez model.

C)      GSI sells guitars made by Hauser II and Hauser III.

**F)      Other Examples of False and Misleading Additions and Deletions**

34)      Without detailing every false statement in the article, the following is a list of the more serious additions and/or changes made by the AG Magazine to the article submitted by R.E. Bruné:

A)      At page 71 the AG Magazine changed Bruné's statement that: "Hauser paved the way for the internationalization of the classical guitar and its construction" into the sentence: "Through their relationship [Segovia and Hauser], Hauser also paved the way for a new wave of classical guitar design that moved in lockstep with spreading popularity and acceptance of concert classical guitar.

**The revised sentence makes it appear that prior to Segovia and Hauser, the guitar was not popular.  However, in countries such as South America and Spain, the guitar very popular and well accepted long *before* Hauser began making Spanish style instruments and long *before* Segovia arrived on the scene.**

B)      At page 72, the AG Magazine replaced Bruné's statement that a "bridge strap," "allows for more even sound," with the statement that "Many players and luthiers attest that the bridge strap facilitates better projection of higher frequencies."

**The statement as rewritten is contrary to well-accepted principals of lutherie, and thus made R.E. Bruné appear ignorant in an area where he is supposed to be at the top of his field.**

C)      At page 72, the AG Magazine replaced R.E. Bruné's statement that "[s]ome early Hauser guitars in the Spanish style had odd features such as . .. ," with the statement that "Hausers propensity for using unusual construction and design techniques extended beyond bracing and body construction."

**The breadth of the AG Magazine's statement implies that Hauser I was eccentric throughout his career and with regard to all of his guitar designs. Bruné's actual statement was limited to a discussion of Hauser's "early" efforts to build "in the Spanish style."**

D)      At page 73, the AG Magazine deleted significant portions of R.E. Bruné's article which made it clear that Hauser, I's son, Hauser, II, had worked under his father from the 1930s

forward, and then took over direction of the Hauser shop in 1952.

**By deleting critical parts of R.E. Bruné's article, the published article makes it appear that Hauser, II first got involved in 1952 when he took over direction from his father.**

E)    At page 73, the AG Magazine inserted the parenthetical into R.E. Bruné's article, "(see the sidebar, "Continuing the Legacy," on page 74)," which was a puff piece written by one of the AG Magazine editors for Hauser III guitars.

**This parenthetical, in combination with the false statement regarding value, makes it appear that R.E. Bruné is endorsing the guitars of Hauser II and Hauser III.**

F)    At page 75, the AG Magazine wrote the statement that Hauser, II "would also return to the taller fan bracing that his father used in the 1950s."

**The article submitted by R.E. Bruné stated  that Hauser, I's "earlier instruments have fan struts taller than they were wide," and that during the latter part of his career, Hauser I "began using fans that were wider than they were tall," but that Hauser, II returned to his father's earlier design (of the 1930s rather than of the 1950s as stated in the article).**

G)    At page 75, the AG Magazine wrote the false statement that  "[m]ost important, they [Hauser I's varnishes] are virtually transparent with respect to tone." R.E. Bruné instead wrote that Hauser I's varnishes did not inhibit the sound.

**As knowledgeable luthiers would know, a varnish that does not inhibit the sound is not the same thing as one that is virtually transparent to tone and would assume that Bruné did not know what he was talking about if they read the article.**

H)    On page 75, the AG Magazine deleted R.E. Bruné's statement that the nitrocellulose laquer finishes used by Hauser II, made it look "like it had been hand padded like french polish, but in effect was much thicker than traditional french polish" into the statement that Hauser II's lacquer finishes were "more akin to a delicate, thin French polish or shellac finish, which many classical players consider the best sounding."

**In short, Bruné's statement that Hauser II's finishes looked like French polish in form, but in substance were much thicker (and thus more inhibiting of sound) was transferred into the false statement that the lacquer finishes used by Hauser II, were both in appearance and substance "akin" to a French polish or shellac finish.**

I)    As noted above, on page 75 of the published article, the AG Magazine added the false statement that:  "[T]oday, guitars built by Hermann Hauser I and his son fetch tens of thousands of dollars at auction."

J)    On page 75 the AG Magazine also added the statement that  Hauser I's name will forever be linked to Andres Segovia, and Hauser II's to legends like Julian Bream, Michael Lorimer, and Pepe Romero.

**This statement is incorrect. Julian Bream was primarily famous for playing a 1940 Hauser I, as well as several other Hauser I instruments, and only owned one Hauser II instrument. Pepe Romero has owned a number of Hausers of all three generations.**

### G)    Attribution of False Photographs and Drawings to Bruné.

35)    Over the years it has been R.E. Bruné's practice to be extraordinarily careful in selecting photographs or drawings for use with his publications. As such, he never submits any photo or drawing of an instrument unless he has actually inspected the instrument to insure the accuracy of his photographs and drawings.

36)    In addition to the article, R.E. Bruné submitted carefully selected photographs and drawings for publication with his article and also included detailed caption information to go with the photographs and drawings and which included information he had left out of the article, but believed would be reflected in caption information.

37)    Unfortunately, the AG Magazine chose to use none of the captions provided by Bruné and chose to use only part of the photographs he submitted. Instead, despite stating that "[a]ll drawings and guitar photos except where noted, by R.E. Bruné."  the AG Magazine added photographs that appeared to have been provided by GSI to the AG Magazine. Specifically:

A)    At page 72 the article included a photo of what was purported to be a 1937 Hauser, along with a picture of the label from the guitar. Neither photograph was provided by Bruné. Additionally, neither picture appears authentic to the 1937 Hauser I that belonged to Segovia.  The photos appear to be photos that have appeared on GSI's website.

B)    At page 73, the article included a photo of a guitar labeled as a 1960 Hauser and a photo of a guitar labeled as a 1958 Hauser.  Neither photo was provided by R.E. Bruné and both appear to be photos that have appeared on GSI's website.

38)    R.E. Bruné would never have approved the use of the foregoing photographs. For

one, R.E. Bruné would never use photographs provided by a competitor, as that would imply his endorsement of that competitor. Second, and more importantly, R.E. Bruné would never allow a photograph to be published under his name without first verifying the accuracy of the photograph and the instrument it purports to show.

39)    At page 73 of the article the AG Magazine also published a picture of a line drawing of the 1920 Hauser patent which Bruné stated in the article he had submitted had been taken from the Franz Jahnel book, Manual of Guitar Technology.  The published article, however, provided no attribution for the drawing, thus making it appear that the drawing was done by R.E. Bruné.

## COUNT I
## Section 1125(a) of the Lanham Act for Injunctive and Other Relief

40)     Plaintiff repeats and realleges Paragraphs 1 through 39 of this Complaint for his Paragraph 40 of Count I of this Complaint.

41)    Section 1125(a) of the Lanham act provides in relevant part:

a)    Civil action

(1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

14

42)     The AG Magazine's publication of false and misleading statements, photos and endorsements under R.E. Bruné's name is a violation of the Section of 1125(a) of the Lanham Act in one or more of the following ways:

A)     The AG Magazine's publication of false and misleading statements, photos and endorsements under R.E. Bruné's name is likely to cause confusion, cause mistake or to deceive as to Bruné's association with the false and injurious statements in the article published by the AG Magazine; and

B)     The AG Magazine's publication of false and misleading statements, photos and endorsements under R.E. Bruné's name is likely to cause confusion, cause mistake or to deceive as to Bruné's sponsorship of photographs, GSI, and the valuation and quality of the guitars of Hauser I, Hauser II and Hauser III, and José Ramírez Guitars.

43)     The AG Magazine's publication of false and misleading statements, photographs and endorsements under R.E. Bruné's name has entered interstate commerce through the AG Magazine's distribution of the magazine in the United States as well as through its publication on the AG Magazine's website.

44)     The AG Magazine's publication of false and misleading statements, photographs and endorsements under R.E. Bruné's name have deceived and have the tendency to deceive a substantial portion of persons who might seek R.E. Bruné's services as a luthier, appraiser, restorer, repairer, author and speaker. As such, the AG Magazine's publication of false and misleading statements, photographs and endorsements under R.E. Bruné's name has caused substantial damages to R.E. Bruné's name and reputation and will likely cause substantial damages in the form of lost business and professional opportunities.

45)     The AG Magazine's publication of false and misleading statements, photos and endorsements under R.E. Bruné's name were made deliberately and willfully, and the AG Magazine knew or should have known that these statements were false and misleading, and that the impact would be to harm Bruné's name and reputation.  As such, this is an exceptional case requiring an award of attorneys' fees to Bruné.

46)     Unless corrected in an appropriate manner, the AG Magazine's publication of false and misleading statements will continue to cause irreparable injury to R.E. Bruné, thereby warranting an injunctive order requiring the AG Magazine to: (i)  redact from its web site and all remaining undistributed copies of its January, 2008 edition the Hauser article published under R.E. Bruné's name;  ii) publish a detailed letter explaining the false statements and endorsements,  and iii)  publish a letter of apology to R.E. Bruné in which the AG Magazine takes full responsibility for its unauthorized changes to Bruné's article.

## COUNT II
## FALSE LIGHT

47)     Plaintiff repeats and realleges Paragraphs 1 through 46 of this Complaint for his Paragraph 47 of Count II of this Complaint.

48)     The AG Magazine's publication of false and misleading statements, photographs and endorsements under R.E. Bruné's name has placed R.E. Bruné name and reputation in a false light before the public.

49)     The false light under which R.E. Bruné's name and reputation has been placed by the AG Magazine would be highly offensive to a reasonable person.

50)     The AG Magazine's publication of false and misleading statements, photographs and endorsements under R.E. Bruné's name was done with knowledge that its publication of

false and misleading statements, photographs and endorsements under R.E. Bruné's name were false or with reckless disregard for whether its publication of the false and misleading statements, photographs and endorsements under R.E. Bruné's name was true or false.

51)    The false light under which R.E. Bruné's name and reputation have been placed by the AG Magazine's actions, has and will continue to cause damage to R.E. Bruné in the form of lost business and professional opportunities.

## COUNT III
## DEFAMATION

52)    Plaintiff repeats and realleges Paragraphs 1 through 51 of this Complaint for his Paragraph 52 of Count III of this Complaint.

53)    The AG Magazine published and communicated the false and misleading statements, photographs and endorsements under R.E. Bruné's name to third persons set forth above in paragraphs 29 through 34.

54)    The noted false and misleading statements, photographs and endorsements under R.E. Bruné's name have and will continue to cause prejudice and damage to R.E. Bruné's profession and business.

## COUNT IV
## ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2)

55)    Plaintiff repeats and realleges Paragraphs 1 through 54 of this Complaint for his Paragraph 55 of Count IV of this Complaint.

56)    Section 2(a) of the Illinois Deceptive Trade Practices Act provides in relevant part that:

(a)    A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

(1)    passes off goods or services as those of another;

(2)    causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)    causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

. . . .

5)    represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

. . . .

(8)    disparages the goods, services, or business of another by false or misleading representation of fact;

. . . .

(12)   engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

57)    The AG Magazine's publication and communication of the false and misleading statements, photographs and endorsements under R.E. Bruné's name to third persons set forth above in paragraphs 29 through 34 are in violation of the excerpted provision from section 2 of the Illinois Deceptive Trade Practices Act.

58)    The AG Magazine's publication and communication of false and misleading statements, photographs and endorsements under R.E. Bruné's name was willful.

59)    R.E. Bruné is entitled to injunctive relief as well as payment of his attorneys fees and cost because of the A.G. Magazine's violations of the Illinois Deceptive Trade Practices Act.

## COUNT V
## CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT(815 ILCS 505/2)

60)     Plaintiff repeats and realleges Paragraphs 1 through 59 of this Complaint for his

Paragraph 60 of Count V of this Complaint.

61)     The AG Magazine's publication of false and misleading statements, photographs

and endorsements under R.E. Bruné's name were also in violation of Section 2 of the Illinois

Consumer Fraud and Deceptive Trade Practices Act and were made with the intent that

consumers would rely on the deception.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Richard E. Bruné requests that judgment be entered in his

favor and that:

A)     The Court enter an order requiring the AG Magazine to:

    (1)     Remove from its web site and all remaining undistributed copies of its

        January, 2008 edition the Hauser article published under R.E. Bruné's

        name;

    (2)     Publish a detailed letter explaining the false statements and endorsements,

        and

    3)     Publish a letter of apology to R.E. Bruné in which the AG Magazine takes

        full responsibility for its unauthorized changes to Bruné's article.

B)     The AG Magazine pay damages in an amount to be proven at trial;

C)     The Court issue and order requiring the AG Magazine to pay attorneys

    fees, legal expenses, costs and any other relief the Court deems just.

**PLAINTIFF DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE IN COUNTS I THROUGH V OF THE COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

**Dated:**          **January 29, 2008**

Respectfully submitted,
R.E. BRUNÉ

By:          s/Edwin L. Durham
Edwin L. Durham
Michael Rachlis
RACHLIS DURHAM DUFF & ADLER, LLC
542 S. Dearborn Street, Suite 900
Chicago, IL  60605
Telephone:     (312) 733-3950
Facsimile:      (312) 733-3952
edurham@rddlaw.net
mrachlis@rddlaw.net

*Attorneys for Plaintiff*